UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

JOSEPH D. VENTURA, JR.,

                            Plaintiff                      DECISION AND ORDER

-vs-

                                            13-CV-6606 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                            Defendant.

_____

APPEARANCES

For the Plaintiff:                Justin M. Goldstein, Esq.
                                  Kenneth R. Hiller, Esq.
                                  Law Offices of Kenneth Hiller, PPLC
                                  6000 North Bailey Avenue
                                  Suite 1A
                                  Amherst, New York 14226

For the Defendant:              Lauren E. Myers, Esq.
                                  Social Security Administration
                                  Office of General Counsel
                                  26 Federal Plaza, Room 3904
                                  New York, New York 10278

                                  Mary Pat Fleming, Esq.
                                  Assistant United States Attorney
                                  Federal Center
                                  138 Delaware Avenue
                                  Buffalo, New York 14202

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Joseph D. Ventura, Jr. ("Plaintiff") for Social Security

Disability Insurance benefits.  Now before the Court is Plaintiff's motion (Docket No. [#8])

1

for judgment on the pleadings, and Defendant's cross-motion [#12] for judgment on the pleadings.  Defendant's application is granted and Plaintiff's application is denied.

PROCEDURAL HISTORY

On November 12, 2010, Plaintiff applied for disability benefits, claiming to be disabled due to the following conditions:"back injury," "learning problems," and "thyroid." (166).[1]  In his application for benefits, Plaintiff indicated that he stopped working on February 6, 2009, when he was laid off from his job, and that his medical conditions became disabling on March 15, 2010. (166)  The Commissioner denied the application.

On February 10, 2012, Administrative Law Judge David J. Begley ("the ALJ") conducted a hearing, at which Plaintiff appeared and testified, accompanied by his attorney.  Plaintiff's attorney argued that he should be found disabled because he could not perform any of his past work and could only perform "significantly less than the exertional requirements required for sedentary work." (19).  With regard to the adequacy of the record before the ALJ, Plaintiff's attorney stated that "an IQ consultative examination" might be needed because Plaintiff "ha[d] a history of special education." (18).  On that point, counsel asked the ALJ to order such an examination in the event that Plaintiff's "exertional limitations weren't enough to support his application for disability." (18).

On April 6, 2012, the ALJ issued a Decision (57-65), finding that Plaintiff was not disabled at any time between the alleged date of onset and the date of the decision.

On June 6, 2012, Plaintiff, through his attorney, appealed to the Appeals Council. (14)  At that time, Plaintiff alleged that he was disabled due to obesity, degenerative disc

---

[1]Citations are to the Administrative Record unless otherwise indicated.

disease, mechanical low back pain, diverticulosis, and a learning disability. (248).

Plaintiff alleged that the ALJ erred by not finding that his back pain and learning disability

were severe impairments. (249)  Plaintiff further alleged that the ALJ failed to follow the

"treating physician" rule and consequently erred in formulating Plaintiff's residual

functional capacity ("RFC").  Additionally, Plaintiff claimed that the ALJ had improperly

evaluated his credibility and committed errors while questioning the vocational expert

("VE"). (251-252).  However, the Appeals Council declined to review the ALJ's

determination. (1-4).

On November 12, 2013, Plaintiff commenced this action.  As will be discussed

further below, Plaintiff maintains that the ALJ's decision was erroneous in several

respects.  First, Plaintiff maintains that the ALJ erred at step two of the five-step

sequential analysis by finding that Plaintiff's back pain and learning disability were not

"severe" impairments.  In connection with that argument, Plaintiff contends that the ALJ

failed to develop the record, because he did not order a consultative IQ test and because

he did not obtain an actual copy of a 2011 MRI test result concerning Plaintiff's back,

which test was discussed in the record.

Next, Plaintiff contends that the ALJ erred in making his RFC determination.  In

that regard, Plaintiff maintains that the ALJ improperly rejected the opinions of treating

physician Dr. Walter Beecher ("Beecher") and non-treating consultative physician Dr.

Robi Rosenfeld, D.O. ("Rosenfeld") and gave undue weight to the opinion of treating-

consulting physician Dr. John Orsini, M.D. ("Orsini").  Plaintiff states, for example, that

the ALJ could not properly rely on Orsini's reports, since they did not express Orsini's

opinion in terms of functional abilities/limitations, and that the ALJ was not qualified to

3

draw his own conclusions as to functional limitations from Orsini's notes and reports.

And finally, Plaintiff maintains that the ALJ erred when evaluating his credibility. For example, Plaintiff contends that the ALJ did not follow the procedure outlined in 20 C.F.R. § 404.1529 and also misstated aspects of the record.

## VOCATIONAL HISTORY

Plaintiff graduated from high school, apparently with a vocational diploma. (23)  In that regard, Plaintiff indicates that he studied "mechanical work," but "really couldn't do it because [he] couldn't grasp how to put stuff together." (23).  Plaintiff indicates that he was in special education classes from fifth grade until graduation. (23)

Subsequently, Plaintiff has held a number of jobs, including laborer, mail supervisor for a airline freight company, assistant restaurant manager, furniture technician at a retail furniture store and pizza maker. (19, 21-22, 167).  More specifically, Plaintiff worked as an assistant manager of a Wendy's restaurant for approximately five years, during which time his duties included hiring and firing staff, making work schedules for employees, handling a "multi phone line" and supervising staff. (210). Similarly, Plaintiff's work as an airline "mail supervisor" required him to hire and fire staff and make out employee work schedules, in addition to sorting mail, recording shipment data and handling issues with U.S. Customs. (192, 210).

In or about 2009, Plaintiff stopped working only because he was laid off, not because of a disability. (21).  Plaintiff continued looking for work after he was laid off, and received twenty-six weeks of unemployment benefits. (21, 24-25).  Specifically, Plaintiff received unemployment benefits through the first quarter of 2011 (24), even though he claims that he became unable to work on March 15, 2010. (166).  Plaintiff acknowledges

4

that as a condition of receiving such benefits he certified that he was "ready, able and willing to work," and that he was in fact seeking work. (25-26).  Nevertheless, he maintains that after being laid off his back pain worsened on its own and now prevents him from working.

ACTIVITIES OF DAILY LIVING

Plaintiff is married and has five children, one of whom is in college. (22).  Plaintiff's wife is employed. (22).  Plaintiff has a driver's license and drove himself to the hearing. (23).  Plaintiff contends, though, that he "sometimes" has difficulty driving, because he needs to "readjust[ his] position in the driver's seat." (23).

Plaintiff also drives fire trucks as a volunteer fireman. (34).  In that regard, Plaintiff has been a volunteer fireman for many years, and states that, "I drive their apparatus when they – when there's [a] house fire." (34).  Plaintiff has indicated that he attends fire department meetings approximately three times per month, and goes out to actual fire calls between one and five times per month. (180).  At the hearing, Plaintiff stated that he had recently been unable to attend a fire call, but that was because his wife was working and he was watching their children. (34-35).

At the hearing, Plaintiff indicated that his typical day involves waking up, getting his children up for school, going back to bed, then getting his youngest child ready for school and putting him on the school bus. (31-32).  After that, Plaintiff indicates that he sits in a chair, listens to music and plays solitaire on the computer. (33).  At the hearing, Plaintiff told the ALJ that he does not watch television (33).  However, when he applied for benefits he indicated that he watched television "every day." (180).  In fact, Plaintiff indicated that he watched television more than ever since his back injury. (180) ("Watch

5

t.v. more since my back got injured.").  Plaintiff also previously told a consulting doctor that he watches television as part of his daily activities. (309).

When Plaintiff applied for benefits, he indicated that his daily activities also included performing "minimal housework," driving one child to school, driving his wife to work, picking up other children from school and picking up his wife from work. (176). Additionally, Plaintiff indicated that he supervised his children in the evenings and helped them with their homework. (177).  However, at the hearing Plaintiff testified that he cannot do housework, with the exception of washing dishes "for maybe about five minutes" before he needs to sit down. (32).  Plaintiff further stated at the hearing that he cannot assist his children with their homework. (35) ("Homework, no, I cannot help them with their homework."); *see also, id*. at 36 ("I just don't understand it.").

When Plaintiff applied for benefits he indicated that he cooks for his family on a "daily" basis (178), but he told a consultative doctor that he does not cook. (309). Plaintiff also states that he used to go shopping with his wife, but not anymore, because walking around the store hurts his back. (32).  It is unclear, though, when Plaintiff allegedly ceased shopping, since when he applied for benefits he indicated that he went shopping once or twice a week, as needed. (179).

Plaintiff states that he is able to bathe and dress himself "at times," though he has his wife stay in the bathroom when he is bathing because "there have been times" when he "ha[s] slipped in the tub." (32).  Plaintiff further contends that he cannot lift more than "five or ten pounds." (30).

Plaintiff further states that he "reads books" and also reads magazines such as ESPN Magazine and Outdoor Life. (33).  Strangely, though, Plaintiff claims that he is

unable to read a newspaper. (36-37).  In that regard, he states that he cannot understand the newspaper unless someone reads it to him, because he has "trouble concentrating." (36-37).  As further evidence of his difficulty concentrating, Plaintiff states that his mind wanders when his wife talks to him. (37).[2]

Nevertheless, Plaintiff indicates that he is able to pay bills and manage a bank account. (180).

Although Plaintiff is able to attend meetings and fire calls with his fire department, he contends that he is completely unable to attend any of his children's school events, and that the last such school event that he attended was eight years ago. (35).[3] Moreover, when Plaintiff was asked to state when he had last taken any kind of trip, he responded, "Never." (36).

## MEDICAL EVIDENCE

Plaintiff's primary physical complaint is pain in his lower back.  Plaintiff also claims to have thyroid problems and diverticulitis, but his thyroid problem appears to be asymptomatic and well-controlled medication (308), and his diverticulitis seems to have been limited to a few acute episodes, the most serious of which required him to be hospitalized for two days. (258, 263, 267, 275-276).

With regard to his alleged cognitive impairment, in 1986, when Plaintiff was eighteen years of age, school testing revealed that his WISC-R verbal score was 80, his

---

[2]The Social Security Administration employee who interviewed Plaintiff when he applied for benefits indicated that she did not observe that he had any difficulty with regard to understanding, coherency, or concentrating. (163).

[3]It is unclear why that would be so,  since the alleged onset date of Plaintiff's disability is only four years ago.

performance scale was 82 and his full-scale score was 79 (240).  Previously, in 1979 and 1983, Plaintiff's WISC-R full-scale scores were 86 and 65-77, respectively. (243).  The school psychologist who reviewed Plaintiff's 1986 testing opined that Plaintiff had put forth "minimal effort" on the achievement portion of the testing, but that Plaintiff nevertheless had "considerable skill deficits." (244).  The psychologist observed, though, that Plaintiff's strengths included his "short-term, rote memory skills," and that his "strengths in certain organizational abilities [had] also been noted by some of [his] previous teachers." (244).   The psychologist noted that Plaintiff had more difficulty with remembering information on a long-term basis, but that there were strategies that he could employ to help him retain information and master new tasks. (244-245).

Since graduating from high school, Plaintiff has never seen a doctor or psychologist for any "emotional or learning problems." (169).  Nor is there any indication that his learning disability interfered with his ability to perform any of his past jobs, several of which required detailed record-keeping.[4]  At most, Plaintiff states that some of his supervisors became frustrated with him because they had to explain things to him more than once. (37).

Plaintiff maintains that he originally injured his back in 1993 while using a sledgehammer at work (308), but there is no indication in the record that he sought medical treatment for such an injury at the time.

On April 19, 2008, Plaintiff received an x-ray of his lumber spine after he complained of pain secondary to a fall. (281) ("40-year-old patient with back pain after a

---

[4]Furthermore, the furniture technician's position involved assembling furniture, and there is no indication that Plaintiff had difficulty performing that work, despite his testimony that in high school he "couldn't grasp how to put stuff together." (21, 23, 191).

fall."). The x-ray was normal, and showed "normal vertebral body heights and disc spaces." *Id*.

Plaintiff's primary care doctor is Walter Beecher, M.D. ("Beecher"). On February 26, 2009, Plaintiff was examined by Beecher's Nurse Practitioner, Susan Lee ("Lee"). (267-268). Plaintiff was complaining of diverticulitis symptoms. (267). Plaintiff apparently did not mention anything related to his back, and although Reed examined Plaintiff she made no comments regarding any back problems or pain. (267).

On April 8, 2009, Beecher examined Plaintiff concerning complaints of chest pain. (265). Plaintiff did not complain of back pain, and Beecher's examination notes do not mention any back problems. (265).

On April 20, 2009, Nurse Practitioner Lee examined Plaintiff concerning a respiratory infection. (261). Plaintiff did not complain of back pain and Lee did not report any problems with his back. *Id*.

On September 23, 2009, Beecher again examined Plaintiff concerning complaints related to diverticulitis. (263). Plaintiff did not complain of back pain, and Beecher did not report any issues with Plaintiff's back. (263).

On March 22, 2010, Beecher examined Plaintiff concerning complaints related to diverticulitis and heartburn. (258-258-260). Plaintiff did not complain of back pain, and Beecher did not report any problems with his back, *id*., which is puzzling since Plaintiff claims that he became disabled due to back pain on March 15, 2010, one week before this visit. (166).

On July 19, 2010, Plaintiff went to see Beecher complaining of back pain. (256). Plaintiff told Beecher that he had experienced low back pain "for years since [a] torn

9

muscle injury while working at RGE." *Id*.  Plaintiff told Beecher that the pain was worse

when standing and bending. *Id*.  Beecher reported that the pain was "most[ly] across

[the] low back without radiation or paresthesias."[5] *Id*.  Beecher prescribed Flexiril for pain.

*Id*.

On December 15, 2010, Plaintiff told Beecher that his back pain was worsening,

and that he had applied for disability benefits. (254).  Plaintiff reportedly told Beecher that

he was discontinuing his activities with the fire department, but as already noted above

he did not in fact do so. *Id*.  Plantiff indicated that his back would "go out with simple

walking," and that the condition would sometimes resolve in hours or days. *Id*.   Plaintiff

further indicated that he needed to "get up" every thirty minutes. *Id*.  Beecher observed

that while the lumbar region was tender, Plaintiff was able to flex 45 degrees and

straight-leg testing was negative. *Id*.  Beecher ordered an MRI. *Id*.

On January 11, 2011, Plaintiff notified the Commissioner that he was going for an

MRI on January 18, 2011. (183).  Apparently the MRI was performed on that date,

although the actual MRI report is not contained in the record.

On February 8, 2011, the Commissioner had Plaintiff undergo a consultative

internal medicine examination by Dr. Rosenfeld.  At that time, Plaintiff reportedly told

Rosenfeld that an MRI had shown "a severe degenerative disk in the lower lumbar area

with no disc space at all," although there is no indication that any MRI actually showed

---

[5]Paresthesia is "a sensation of prickling, tingling or creeping on the skin having no objective cause and usu. associated with injury or irritation of a sensory nerve or nerve root." MERRIAM WEBSTER'S MEDICAL DESK DICTIONARY (1993).

that. (308).[6]  Plaintiff essentially told Rosenfeld that he needed to be lying down in order to avoid back pain. *Id*.  Plaintiff indicated that he was able to shower, bathe and dress by himself. (309).  Plaintiff told Rosenfeld that his wife and children performed all shopping, cooking and household chores. *Id*.  Plaintiff also told Rosenfeld that he spent his days watching television, listening to the radio and "sociali[zing] occasionally." *Id*.  Apparently, Plaintiff did not tell Rosenfeld about his activities with the fire department. (308-311).

Rosenfeld performed a physical examination, and observed that Plaintiff had a normal gait, normal stance, was able to arise from his chair "without much difficulty" and could get on and off the exam table without assistance, but with apparent "difficulty." (309).  Plaintiff could walk on his heels and toes, but with difficulty. *Id*.  Plaintiff's cervical and thoracic spine were normal. (310).  Plaintiff had no neurological deficits, full strength and range of movement in all extremities, full hand and finger dexterity and full grip strength. *Id*.  Rosenfeld also reported that Plaintiff's "mental status screen" was normal. (310-311).

As for Plaintiff's lumbar spine, Rosenfeld reported that Plaintiff declined to perform any flexion or extension ("Claimant said he cannot do it.") and had very limited lateral flexion. (310).  Rosenfeld may have observed positive findings on the straight-leg-raising test, though his statements on that point are somewhat ambiguous inasmuch as he did not actually say either "positive" or "negative." *Id*. ("The claimant notice pain  and said

---

[6]The reasonable conclusion to be drawn from Rosenfeld's report is that Plaintiff described the MRI to him.  In that regard, the aforementioned description is contained in the history section of the report comprising information that Plaintiff related to Rosenfeld, and there is no indication that Rosenfeld (or Plaintiff, for that matter)  actually had a copy of the MRI report.  As for the inaccuracy of Plaintiff's description of the MRI, it is notable that even Beecher does not claim that the MRI showed what Plaintiff said it showed.

that his pain is across the lumbar area with any kind of movement and with touch.").[7]   In

any event,  Rosenfeld's diagnosis was "low back pain due to degenerative disk disease,"

and he indicated that Plaintiff had the following restrictions:  "The Claimant has mild

restriction in standing and sitting.  He has moderate restriction in walking, climbing stairs,

lifting and carrying.  He has marked restriction in bending and kneeling." (311).

On March 23, 2011, Plaintiff returned to Beecher, still complaining of back pain.

(339-340).  Plaintiff told Beecher that his back pain was worse, that he was only going

out on "occasional fire [department] calls," and that he had applied for disability benefits.

(339).  Plaintiff also stated that he was sleeping well at night and felt refreshed during the

daytime. (339).[8]  Beecher did not conduct a physical examination, and noted that Plaintiff

was awaiting a consultation with orthopaedic specialist Dr. Orsini. (339).  Beecher told

Plaintiff to consider losing weight and trying physical therapy. *Id*.   Beecher made no

mention of the MRI.

On April 27, 2011, Plaintiff was examined by Dr. Orsini at Beecher's request. (343-

344).  Plaintiff reportedly told Orsini that he had injured his back eighteen years earlier,

with "some [unspecified] exacerbation several years later," but that he "has essentially

had the same pain." (343). Plaintiff indicated that he had tried treating the pain with heat

and cold, but had never tried physical therapy. *Id*.  Upon physical examination, Orsini

observed that Plaintiff had a normal gait and normal posture while sitting and standing.

---

[7]Moreover, as discussed elsewhere in this Decision and Order, Beecher and Orsini both reported negative straight-leg-test findings. (254, 343).

[8]Plaintiff contradicted that statement at the hearing, when he told the ALJ that he slept poorly due to "the shooting pain in [his] lower back." (33).  That statement is also contradicted in Beecher's RFC report in which he stated, apparently based on Plaintiff's statement to him, that Plaintiff had "impaired sleep." (358, 359).

*Id*. Plaintiff was "able to stand on his toes and heels and do partial knee bend on double and single leg stance without difficulty," and straight leg raise testing was negative. *Id*. Orsini examined Plaintiff's spine and found no abnormalities. *Id*.   Orsini also conducted a neurological examination that was normal in all regards, and Plaintiff showed "good strength" in all his extremities. (344).  As for the recent MRI, Orsini reviewed it and stated:

> MRI was reviewed in detail today.  It shows well-maintained intravertebral disk height and hydration at all levels.  It shows no focal herniation or protrusion.  It shows no stenosis [9] of the foramen or canal of any significance at any level.  Facets are well maintained throughout.

(344). In that regard, Orsini noted that while the radiologist's report referenced "mild stenosis," he did not find anything to explain Plaintiff's complaints:

> I do not think there is anything to cause symptoms there or a specific causative relationship for his chronic low back pain.  I think this is primarily mechanical low back pain with probably some myofascial component.  I think that lumbar stabilization and weight loss would be the best option for him.  I have given him a prescription for physical therapy to initiate those changes.  If no significant improvement is seen along those lines, then I would suggest a pain management approach and no specific follow-up of spine is indicated at this point.

(344).[10]

On June 22, 2011, Plaintiff returned to see Beecher complaining of bronchitis.

---

[9]According to the website of the Mayo Clinic, "[s]pinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine."
http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105?footprints=mine

[10]Plaintiff acknowledges that Orsini found nothing wrong with his back.  In that regard, Plaintiff states that Dr. Orsini told him , "Nothing is wrong, my back is fine." (213); *see also*, (246) ("He claimed there is nothing wrong with my back despite what the radiologist said.").

(351).  Beecher reported that Plaintiff had been to see Orsini, and that Orsini had indicated that Plaintiff did not need surgery or further follow-up, except for physical therapy and, if that was not successful, pain management. *Id*.  Plaintiff reportedly told Beecher that he was going to physical therapy but was experiencing "no overall change." *Id*.  However, Beecher observed that Plaintiff was "moving fairly easily." *Id*.

On August 24, 2011, Plaintiff returned to see Beecher about back pain. (353). Plaintiff told Beecher that his pain was worsening.  Plaintiff also told Beecher that his disability appeal was still pending, and provided Beecher with a list of limitations allegedly imposed by his back pain. *Id*.  Specifically, he told Beecher that he could "sit/stand" for less than ten minutes, could walk less than thirty minutes, and perform only "minimal lifting." *Id*.  Furthermore, while it had nothing to do with any treatment that he was receiving, Plaintiff volunteered that he had been in special education classes in school. *Id*. ("Mentions did graduate from 12th grade, but considered spec. ed all along, somewhat slow, delayed milestones since birth, poor reading and math skills.").  Upon examination, Plaintiff had "perilumbar tenderness" and "limited flexion," but straight leg testing was negative. (353).  As for a treatment plan, Beecher stated:  "MR scan with only deg changes, review of Dr. Orsini's note suggests mechanical LBP with advised PT, weight loss.  Sounds like trial not adequate .... [sic] will request old record , consider further PT or pain management." *Id*.

On January 11, 2012, Beecher completed a "Lumbar Spine Residual Functional Capacity Questionnaire" that was apparently provided by Plaintiff's attorney. (358-360). Beecher indicated that he had been treating Plaintiff generally since 1995, and that Plaintiff had first complained of "back strain" in 2002, though the bulk of Plaintiff's visits

14

concerning back pain had occurred between 2010 and the present. *Id*.  Beecher

indicated that his primary diagnosis was "mechanical low back pain with myofascial

component," and when asked to explain the "clinical findings, laboratory and test results"

that supported his diagnosis he stated in pertinent part: "Mild difficulty rising from chair.

Reduced ROM of trunk:  flexion 45 [degrees], [decreased] extension, [decreased]

abduction." (358).  Significantly, in the Court's view, Beecher did not purport to base his

opinion on any MRI testing.  When asked to list any "positive objective signs," Beecher

listed reduced range of motion, reduced flexion, and reduced abduction. (359).[11]

Beecher stated that Plaintiff's pain would interfere with his attention and concentration

"frequently," and that Plaintiff could only sit for ten minutes before needing to change

position. (359).  Beecher further indicated that Plaintiff could never twist, stoop, crouch,

or climb ladders. (360).  Curiously, though, Beecher indicated that Plaintiff could

"frequently" climb stairs, even though he indicated earlier in his report that Plaintiff's pain

was exacerbated by climbing stairs. (358, 360).  Beecher further indicated that Plaintiff

had no limitations on his ability to use his hands, fingers and arms for repetitive tasks,

but still stated that Plaintiff could only lift less than ten pounds, and then only "rarely."  *Id*.

Beecher also stated that Plaintiff would likely miss "about three days per month" of work

because of his back pain. *Id*.

With regard to Beecher's RFC report, the Court observes that the copy that was

scanned into the record is missing half of the third page due to a photocopying or

scanning overlap error. (359).  At the hearing, the ALJ and Plaintiff's attorney discussed

---

[11]Beecher also listed "impaired sleep," but that does not seem to be any type of objective sign that he would have observed.

that fact, and Plaintiff's attorney, who had the complete original and referred to it during her questioning of the VE, indicated that she would re-submit a clearer copy, to which the ALJ responded, "Please do." (43-44).[12]  Apparently, though, Plaintiff's attorney did not do so, since it does not appear in the record, and Plaintiff now blames the ALJ for the omission.

At the hearing, Plaintiff testified that he sees Dr. Beecher "two or three times a month," for his "lower back and thyroid" (26-27), but that is contradicted by the record which indicates that he saw Beecher far less frequently.  Plaintiff also told the ALJ that the aforementioned MRI showed that he has "a bone fragment that's floating near [his] spine that hits the nerves," but none of the doctors in this action have made any such statement. (27).  To the contrary, there is no evidence of any neurological involvement in Plaintiff's alleged pain.

At the hearing, Plaintiff further indicated that the level of pain in his lower back is usually ten, on a scale of one-to-ten. (29).  However, Plaintiff takes only "prescription ibuprofen" for his back pain. (27-28).  Plaintiff also stated that apart from taking ibuprofen, he does not do anything else to alleviate his pain, such as using "heat, cold [or] massage" (29), and that although he went to physical therapy for a brief time, he "couldn't do the exercise that they want[ed] [him] to do." (30).  When asked to describe his back pain, Plaintiff stated:  "[I]t's a shooting pain that goes from right-to-left and left-to-right all the time and it causes me to not be able to sit for a long period of time.  I have to stand for a little bit.  I can't really do a lot.  Like I can't be at – I can't do like any

---

[12]Consequently, Plaintiff's statement at page 19 of his brief [#8-1], footnote 4, that the ALJ did not request a full copy of the report, is inaccurate.

housework[.]" (28).  Plaintiff contends that activities such as "getting up to answer the

door or phone" cause his back pain to "flare." (29).  When asked how far he could walk,

Plaintiff responded that it was "hard so say." (30).  Plaintiff stated, though, that he could

only stand for "about ten minutes [at] the most," and that he could sit for about ten

minutes before needing to stand up. (30).  Plaintiff stated that he is completely unable to

use stairs without help (31), even though as indicated earlier Beecher stated that Plaintiff

was capable of using stairs "frequently."

Plaintiff also told the ALJ that he has difficulty using his hands, because they

"sometimes" "go numb on [him]," which he attributes to "poor blood circulation, or

whatnot." (31).  However, there is nothing in the medical record to substantiate any type

of circulatory problem or other problem with Plaintiff's hands.  To the contrary, as

indicated above, Beecher opined that Plaintiff had no limitations on using his hands.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner

of Social security as to any fact, if supported by substantial evidence, shall be

conclusive."  The issue to be determined by this Court is whether the Commissioner's

conclusions "are supported by substantial evidence in the record as a whole or are based

on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

Substantial evidence is defined as "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to . . . last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

### THE ALJ'S DECISION

On April 6, 2012, the ALJ issued the decision that is the subject of this action. (57-65).  At the first step of the five-step sequential analysis described above, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 15, 2010, the alleged onset date. (59).  At the second step of the analysis, the ALJ found that Plaintiff had the following severe impairments: "obesity, hypertension, hyperthryroid, and diverticulitis." (59).  The ALJ found that Plaintiff's learning disability and back pain were not severe impairments.  At step three of the five-step analysis, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (59-60).

Prior to reaching step four of the analysis, the ALJ determined that Plaintiff had the following RFC:

> [T]he claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) except he requires the option to alternate between sitting and standing to alleviate pain and

discomfort; he cannot use ladders, ropes or scaffolds; and he can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl.

(60). Notably, this RFC determination contains no restriction for Plaintiff's cognitive abilities. In making this RFC determination, the ALJ indicated that he found Plaintiff's statements not credible, to the extent that they claimed he could do less than what is indicated by the RFC determination. (61). In that regard, the ALJ noted, for example, that although Plaintiff was labeled as learning disabled in school, he had "no history of mental health complaints or treatment," was able to use a computer and "spen[t] his days reading books and magazines." (61). The ALJ explained that he declined to order additional IQ testing because "[t]he medical record and testimony fail[ed] to offer any substantive basis" for such testing. *Id.*[13]

Regarding the credibility of Plaintiff's complaints of back pain, the ALJ noted that the 2008 CT scan was negative and that Plaintiff had only begun complaining of back pain in 2010. (61). The ALJ also found Plaintiff incredible based on his "inconsistent statements," many of which the Court pointed out earlier: "The undersigned found the combination of the claimant's testimony, his erroneous description of the record, and his testimonial revision to his literacy abilities undermined the overall veracity of the claimant's asserted impairments." (63).

Additionally, the ALJ referenced Orsini's examination report, which was negative for any underlying spinal disease based on the MRI and his own examination. (62). The ALJ indicated that he gave great weight to Orsini's opinion that Plaintiff's back pain was

---

[13]The ALJ noted, for example, that agency reviewer Lisa Blackwell, Ph.D., "determined the claimant had no severe mental health impairments." (63).

not due to spinal problems, and was most likely "mechanical with myofascial component," and could be addressed by Plaintiff losing weight and having physical therapy. (62) ("The undersigned gave Dr. Orsini's opinion great weight, due to his expertise and specialization in orthopedic medicine combined with his detailed examination and review of the MRI[.]").  The ALJ indicated that he gave "little weight" to Beecher's RFC statement for several reasons, including the fact that it seemed inconsistent with Orsini's report and with his own conservative treatment of Plaintiff's complaints, which consisted primarily of providing Ibuprofen. (62).  However, the ALJ indicated that he still gave some deference to Beecher's report by restricting Plaintiff's abilities with regard to sitting and bending, as noted above. (62).

As for Rosenfeld's report, the ALJ indicated that he gave it "little weight" for several reasons, including that it seemed Rosenfeld had relied largely on Plaintiff's self-described symptoms and limitations, as opposed to actual clinical findings. (62).  The ALJ observed that in light of his findings regarding Plaintiff's lack of credibility, such fact detracted from Rosenfeld's report. *Id*.

At step four of the five-step analysis, the ALJ found that Plaintiff could not perform any of his past relevant work. (63)  However, at step five of the analysis, the ALJ found, based on testimony from a vocational expert, that with the RFC set forth above Plaintiff could still perform other jobs in the national economy. (64-65).  Specifically, the ALJ found that, although Plaintiff could not perform the full range of light work, due to his back pain, he could perform at least three light jobs: ticket seller, DOT 211.467-030, toll collector, DOT 211.462-038 and order caller, DOT 209.667-014. (65).[14]

---

[14]The VE testified that these jobs could be performed while either sitting or standing. (42).

DISCUSSION

The ALJ's Credibility Determination

The Court begins with Plaintiff's objections concerning the ALJ's evaluation of his credibility.  Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in the Commissioner's regulations, which state, in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b)(2) through (8) and 404.1513(b)(1), (4), and (5), and (d). These include statements or reports from you, your treating or nontreating source, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your treating source or nontreating source, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
>
> ***
>
> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in relevant part:

21

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

However, while an ALJ is required to consider these factors, he is not required to explicitly discuss each one of them. *See, Pellam v. Astrue*, 508 Fed.Appx. 87, 91, 2013 WL 309998 at *3 (2d Cir. Jan. 28, 2013) ("The ALJ did not apply an incorrect legal standard when judging the credibility of Pellam's testimony. Although the ALJ did not explicitly discuss all of the relevant factors, Pellam has failed to point to any authority requiring him to do so. In any event, the ALJ cited the applicable regulation, 20 C.F.R. § 404.1529, explicitly mentioned some of the regulatory factors (such as Pellam's limited use of pain medication), and stated that he considered all of the evidence required by § 404.1529."). If it appears that the ALJ considered the proper factors, his credibility determination will be upheld if it is supported by substantial evidence in the record. *Id*.

In this action, Plaintiff maintains that the ALJ erred by making his RFC determination first, and then finding him not credible to the extent his statements were inconsistent with the RFC finding: "[T]he ALJ improperly arrived at his RFC determination before making his credibility assessment, and he engaged in a credibility

assessment calculated to conform to that RFC determination."[15]  Additionally, Plaintiff

contends that the ALJ failed to follow 20 CFR § 404.1529 by misstating the record.

However, the Court disagrees.

Contrary to what Plaintiff alleges, this is not a situation where the ALJ arrived at an

RFC determination and then merely found that the claimant lacked credibility to the

extent that his claims were inconsistent with the RFC finding.[16]  To the contrary, the

ALJ's decision explicitly states that he first evaluated Plaintiff's credibility, which then

affected his RFC determination. *See*, (60-61,63).  More specifically, after providing a

detailed discussion as to why he found that Plaintiff lacked credibility, the ALJ stated:

> The undersigned found the combination of the claimant's testimony, his
> erroneous description of the record, and his testimonial revision to his
> literacy abilities undermined the overall veracity of the claimant's asserted
> impairments. *The undersigned, therefore, declined to afford him the benefit
> of the doubt while evaluating his residual exertional capacity or non-
> exertional mental health impairments or limitations*.

(63) (emphasis added).  Moreover, the ALJ stated that he "considered all symptoms and

the extent to which these symptoms can reasonably be accepted as consistent with the

objective medical evidence and other evidence, based on the requirements of 20 CFR

404.1529 and SSRs 96-4p and 96-7p." (60).

Furthermore, the ALJ's credibility finding is clearly supported by substantial

evidence, inasmuch as Plaintiff's testimony and written statements concerning the extent

---

[15]Pl. Memo of Law at p. 27.

[16]*Compare, e.g., Gehm v. Astrue*, No. 3:10–CV–1170, 2013 WL 25976 at *5 (N.D.N.Y. Jan. 2, 2013) ("A claimant's credibility may be questioned if it is inconsistent with the medical evidence. However, it is improper to question the plaintiff's credibility because it is inconsistent with the RFC determined by the ALJ.").

of his limitations are rife with contradictions, as noted above.  For example, Plaintiff

claims that he is able to read books and magazines, manage his family's money and

bills, hire and fire employees, make out work schedules, record freight shipment data

and handle problems with U.S. Customs for his employer, but maintains that he is unable

to understand a newspaper unless someone reads it to him.  Further, he maintains that

he is able to drive a fire truck and attend fire calls on a weekly basis, but contends that

his back pain completely prevents him from attending *any* of his children's school

activities.  Plaintiff has also made flatly contradictory statements about his ability to assist

his children (some of whom are in elementary school) with their homework and about his

activities of daily living, such as whether he watches television.[17]

Additionally, the Court does not agree that the ALJ misstated the record.  For

example, Plaintiff maintains that the ALJ erroneously stated that Plaintiff only sought

treatment from Beecher for back pain in July and December 2010. Pl. Memo of Law at p.

28.  However, the portion of the record that Plaintiff cites for support was a statement in

which the ALJ was only discussing events in 2009 and 2010. (61).  Later in the decision,

the ALJ discussed Plaintiff's visits to Beecher in 2011 and 2012. (62).  Plaintiff further

contends that the ALJ was wrong to question his credibility based on Plaintiff's purported

misstatement about the contents of the MRI, since "there are interpretations of the

diagnostic imaging that is consistent with Plaintiff's testimony.". Pl. Memo of Law at p. 28.

---

[17]Plaintiff also collected unemployment benefits for almost a year after he claims that he became unable to work, which detracts from his credibility. *See, e.g., Bridges v. Colvin*,  2014 WL 2207971, 6 (W.D.N.Y. May 28, 2014) ("Once plaintiff claimed unemployment benefits, thereby certifying he was ready, willing, and able to work, the ALJ could factor that into the credibility determination as it fundamentally conflicts with plaintiff's contention that he suffers from a disability and an inability to work.").  Although the ALJ did not refer specifically to that fact in his decision, he indicated that he based his credibility determination in part on Plaintiff's "testimony" (63), and it is evident that the ALJ focused on that fact during his examination of Plaintiff. (24-25).

Again, the Court disagrees.  As discussed below, there is no support in the record for Plaintiff's testimony that he had an MRI showing "a bone fragment that's floating near [his] spine that hits the nerves." (27).   If such evidence exists outside the record, Plaintiff's failure to provide it is inexplicable.

Consequently, Plaintiff's arguments regarding the ALJ's credibility determination lack merit.

### The ALJ's determination that Plaintiff's learning disability and back pain are not severe impairments

Plaintiff next maintains that the ALJ erred at step two of the sequential analysis by finding that his back pain and learning disability are not severe impairments.  In that regard, "[a] claimant has the burden of establishing that [he] has a "severe impairment," which is "any impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work." *Woodmancy v. Colvin*, — Fed.Appx. — , 2014 WL 4290397 at *1 (2d Cir. Sep. 2, 2014) (citation omitted).  However, the Court finds that the ALJ's determination concerning Plaintiff's learning disability is supported by substantial evidence, since Plaintiff did not show that such disability significantly limited his ability to work.  For example, the ALJ noted that Plaintiff never sought treatment for such condition, and that Plaintiff's activities of daily living were inconsistent with a severe learning disability.  In sum, while Plaintiff has shown that he has a record of a learning disability while in school, he has not shown that such condition has affected his ability to work at all, let alone significantly.  Consequently, the Court finds that the ALJ did not err

by declining to obtain additional psychological testing.[18]

As for Plaintiff's contention that his back pain is a severe impairment, the Court finds that even if that is true, the error by the ALJ would be harmless, since the ALJ proceeded through the sequential analysis, and took Plaintiff's complaints of pain into account when making his RFC determination. *See, Woodmancy v. Colvin*, 2014 WL 4290397 at *1, n. 1 (Indicating that an error to include an impairment at step two is harmless where the ALJ finds that other impairments are severe, proceeds through the sequential analysis and considers the non-severe impairments when determining whether the claimant is disabled.).  Indeed, the ALJ found that the only restrictions on Plaintiff's ability to perform light work arose from his back pain.  Consequently, even assuming *arguendo* that the ALJ erred at step two by finding that Plaintiff's back pain was not severe, such error does not require reversal or remand.  Additionally, the Court finds that the ALJ did not err in failing to obtain a copy of the 2011 MRI.  At the outset, there was nothing preventing Plaintiff's counsel from submitting the MRI at the hearing, if she felt that it was necessary.  More importantly, Orsini's report describes and interprets the MRI data, including the radiologist's opinion, and Plaintiff has not shown that Orsini's statements in that regard were inaccurate in any way.

------

[18] *See, e.g., Colon-Torres v. Colvin*, No. 6:12–cv–1591 (GLS), 2014 WL 296845 at *2 (N.D.N.Y. Jan. 27, 2014) ("While the ALJ has an affirmative obligation to develop the administrative record, her duty to do so is not without limit.  Indeed, if all of the evidence received is consistent and sufficient to determine whether a claimant is disabled, further development of the record is unnecessary, and the ALJ may make her determination based upon that evidence.  Consistent with that notion, where there are no 'obvious gaps' in the record, the ALJ is not required to seek additional information.  Moreover, the ALJ is afforded discretion in determining whether a consultative intelligence exam is warranted.  As with development of the record generally, a consultative examination is unnecessary if the record contains sufficient information on which to base the decision .") (citations and internal quotation marks omitted).

The ALJ's RFC determination

Plaintiff next maintains that the ALJ erred, in his RFC determination, by giving more weight to Orsini's opinion than he did to the opinions of Beecher and Rosenfeld. Plaintiff's argument on that point relies in part on the purported fact that Orsini's report does not explain what he can and cannot do.  Plaintiff further maintains that because of that, the ALJ could not rely on Orsini's report to find that he is not disabled, since the ALJ is not qualified to interpret Orsini's report to make an RFC determination.  Consequently, Plaintiff maintains, the ALJ should have given significant weight, if not controlling weight, to Beecher's opinion, and found him disabled.

However, Plaintiff's contention that the ALJ "discounted" Beecher's RFC report[19] is not entirely accurate, since the ALJ included several limitations in the RFC determination relating to Plaintiff's back pain.  More specifically, the ALJ included limitations on Plaintiff's ability to sit, stand, squat, use ladders and stoop, all of which he took from Beecher's RFC report.  (62) ("The undersigned did, however, accommodate the limitation to the claimant's range of motion  and flexion described by Dr. Beecher by limiting him to job[s] that do not require the use of ladders, ropes or scaffolds; and require only occasional climbing [of] ramps and stairs, balancing, stooping, kneeling, crouching and crawling.").

Similarly, Plaintiff's contention that Orsini's report fails to indicate what he can and

---

[19]The Court does not agree that the ALJ erred by failing to include a clearer and more complete page 3 of Beecher's report in the record.  Plaintiff's counsel told that ALJ that she would re-submit the page, but she apparently chose not to do so.  Since the document was in her possession, it is unclear how she expected the ALJ to obtain it if she did not submit it.  In any event, Plaintiff has not explained why having page three of that report re-submitted would have affected the outcome of the Commissioner's determination.

cannot do is not entirely accurate, since the report clearly indicates, as Plaintiff himself recognized (213, 246), that Orsini did not think that there was anything wrong with Plaintiff's spine, or with his back generally except for possible muscle strain that could likely be corrected by conditioning and losing weight.  Therefore, the reasonable inference to be drawn from Orsini's report is that Plaintiff did not have any significant limitation on his abilities apart from what might be caused by a muscle strain. In other words, if a doctor finds a definite problem with a claimant's back, it makes sense for him to list the particular activities which the claimant should not perform; but where the doctor finds nothing wrong, one does not expect him to endlessly list all the activities which the claimant can perform.

Nevertheless, Plaintiff is correct that the ALJ gave "great weight" to Orsini's report while giving "little weight" to the opinions of Beecher and Rosenfeld. (62).  However, the Court does not agree that it was improper for the ALJ to do so.  In that regard, the ALJ explained why he gave more weight to Orsini's report:  "The undersigned gave Dr. Orsini's opinion great weight, due to his expertise and specialization in orthopedic medicine combined with his detailed examination and review of the MRI." (62).  On the other hand, the ALJ explained that Beecher's opinion was deserving of lesser weight for various reasons, including that it was not supported by his own treatment notes, and was inconsistent with Orsini's report:

> The degree of limitation described by Dr. Beecher is not [in] any way commensurate with his own treatment record of the claimant.  . . .  [T]he only pain medication [that Beecher] prescribed for the claimant was 400 mg Ibuprofen, 1-2 tabs every 6-8 hours. . . .  Dr. Beecher's opinion  conflicts with the examination , observations and recommended treatment  and course prescribed by the orthopedic specialist [Orsini].

28

(62).  As discussed above, Orsini's examination was far more thorough than any

examination that Beecher conducted, and in fact the only findings that Beecher made

concerning Plaintiff's back was a finding of mild tenderness and limited flexion, with

negative straight-leg-raising tests. (254, 353).  Apart from that, Beecher seems to have

based his RFC statement entirely on Plaintiff's subjective statements, including

statements related to alleged mental impairments that had nothing to do with his

treatment at the time, but which Plaintiff apparently wanted included in his medical record

as support for his pending SSDI application.[20]  In that regard, Beecher's RFC report

seems to be based on what Plaintiff said, as opposed to anything that Beecher actually

observed during an examination.  However, as discussed earlier, the ALJ found that

Plaintiff's subjective statements were contradictory and inconsistent with his activities of

daily living.  As for Rosenfeld's opinion, the ALJ gave similar reasons for giving it lesser

weight (62).  For example, as the ALJ found, it appears that when Rosenfeld drafted his

opinion he relied on Plaintiff's statement that there was an MRI which showed "a severe

degenerative disk in the lower lumbar area with no disk space at all," even though there

is no such MRI of which the Court is aware. (308).[21]  Moreover, unlike Orsini, there is no

indication that Rosenfeld reviewed the 2011 MRI as part of his evaluation.  For all of

these reasons, the Court finds that the ALJ's analysis, with regard to the opinions of both

Beecher and Rosenfeld, is not contrary to law and is supported by substantial evidence.

---

[20]At the same time that Plaintiff told Beecher about his learning disability, he mentioned that his SSDI case had been pending for two years. (353).

[21]In any event, Rosenfeld indicated that Plaintiff had only "mild" restriction with regard to sitting and standing (311), which is contrary to both Plaintiff's contention and Beecher's RFC report.

CONCLUSION

Plaintiff's motion (Docket No. [#8]) for judgment on the pleadings is denied, and

Defendant's cross-motion [#12] for judgment on the pleadings is granted.  The Clerk of

the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
          October 2, 2014

                                        ENTER:


                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge